**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION**

| | |
|---|---|
| **JEFFREY GARDNER,**<br><br>    **Plaintiff,**<br><br>v.<br><br>**JASON BOHANNAN; JAMIE WILSON; JAMES JACOBS; LARRY PERRY; GARRETT ABLE; CHRISTOPHER BEERS; AND DILLON VEAL,**<br><br>    **Defendants.** | **CIVIL ACTION NO.:** CV524-81<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff Jeffrey Gardner hereby files this Complaint against Defendants, showing this Honorable Court and the jury as follows:

### INTRODUCTION

1.  Plaintiff Jeffrey Gardner was a pretrial detainee at the Brantley County Jail from August 13, 2023 through August 31, 2023. Over that 19-day period, Mr. Gardner was never arraigned. He was never booked into the jail or assigned to a permanent housing unit. He never saw a judge. And he was deprived — either intentionally or due to deliberate indifference — of food, water, and necessary medical care.

2.  On August 31, after days of indifference towards Mr. Gardner's condition, jail officials contacted 911 after finding the (then) 48-year-old Gardner on the ground and unable to get up. He was taken by EMS directly to the Emergency Room at Memorial Satilla Hospital. There, he was diagnosed with severe sepsis, severe dehydration, acute kidney injury, hypothyroidism (a complication of severe starvation), hyponatremia, and several other critical

conditions. He also suffered from "[e]xtesive pneumomediastinum," suggesting physical trauma. He was in an altered mental status, making it difficult (if not impossible) for providers to get information from him. And he weighed approximately 132 pounds, down nearly 70 pounds from the 200-lbs weight listed on his August 13, 2023 booking report.

3.       Mr. Gardner received extensive medical treatment from his admission in the afternoon on August 31, 2023 through his discharge on September 5, 2023. He had stabilized at the time of discharge, but he continues to suffer from lasting physical and emotional symptoms to this date.

4.       In this action, Mr. Gardner alleges that he suffered the injuries described above because Brantley County law enforcement officers and a private medical contractor acted with deliberate indifference to a serious risk of harm in violation of the Eighth and Fourteenth Amendments to the United States Constitution. He also asserts that the Brantley County officers were negligent in violation of Georgia law. His theories of recovery may overlap and/or be pleaded in the alternative.

**PARTIES**

5.       Mr. Gardner is an adult resident citizen of the State of Georgia.

6.       Defendant Jason Bohannan is, and was at all times relevant to this Complaint, a law enforcement officer with the Brantley County Sheriff's Office and the Jail Administrator for the Brantley County Jail. He is sued in his individual capacity. At all times relevant to this Complaint, Bohannan acted under the color of law. Bohannan is a resident of Brantley County, Georgia

7.       Defendant Jamie Wilson (née Lipe) was, at all times relevant to this Complaint, a law enforcement officer with the Brantley County Sheriff's Office and the Medical Officer for the

Brantley County Jail. She is sued in her individual capacity. At all times relevant to this Complaint, Wilson acted under the color of law. Wilson is a resident of Pierce County, Georgia.

8. Defendant Christopher Beers was, at all times relevant to this Complaint, a law enforcement officer with the Brantley County Sheriff's Office who worked at the Brantley County Jail. He is sued in his individual capacity. At all times relevant to this Complaint, Beers acted under the color of law. Beers is a resident of Brantley County, Georgia.

9. Defendant Garett Able was, at all times relevant to this Complaint, a law enforcement officer with the Brantley County Sheriff's Office who worked at the Brantley County Jail. He is sued in his individual capacity. At all times relevant to this Complaint, Able acted under the color of law. Able is a resident of Brantley County, Georgia

10. Defendant James Jacobs is, and was at all times relevant to this Complaint, a law enforcement officer with the Brantley County Sheriff's Office who worked at the Brantley County Jail. He is sued in his individual capacity. At all times relevant to this Complaint, Jacobs acted under the color of law. Jacobs is a resident of Brantley County, Georgia.

11. Defendant Larry Perry is, and was at all times relevant to this Complaint, a law enforcement officer with the Brantley County Sheriff's Office who worked at the Brantley County Jail. He is sued in his individual capacity. At all times relevant to this Complaint, Perry acted under the color of law. Perry is a resident of Pierce County, Georgia. Defendants Perry, Bohannan, Wilson, Beers, Able, and Jacobs are hereinafter referred to collectively as the "Brantley County Defendants."

12. Defendant Dillon Veal is, and was at all times relevant to this Complaint, a licensed physician assistant with Faith Family Practice, a private medical contractor at the Brantley County

Jail. He is sued in his individual capacity. At all times relevant to the Complaint, Veal acted under the color of law. Upon information and belief, Veal is a resident of Ware County, Georgia.

## JURISDICTION AND VENUE

13. This Court has federal question jurisdiction over Mr. Gardner's claims because they arise under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution. *See* 28 U.S.C. § 1331. It has supplemental jurisdiction over Mr. Gardner's state law claims because they arise from common facts and form part of the same case or controversy. *See* 28 U.S.C. § 1367.

14. This Court has general personal jurisdiction over the defendants because they are all resident citizens of the state of Georgia, and specific personal jurisdiction over the defendants because the wrongful conduct underlying Mr. Gardner's claims occurred in Georgia.

15. Venue is proper in the Southern District of Georgia, Waycross Division because the events giving rise to this action occurred in Brantley County, and the defendants all reside in counties within the Waycross Division.

## FACTS

16. Mr. Gardner has a history of, and has been medically diagnosed with, a serious mental illness.

17. In the morning hours of August 13, 2023, Mr. Gardner was arrested and transported to the Brantley County Jail. The arresting officer alleged that when he arrived on scene, Mr. Gardner was naked (in public) and made no effort to cover himself. Mr. Gardner was also allegedly talking to himself and making gestures. The arresting officer believed that "illicit drugs may have aggravated an underlying mental issue."

18. Mr. Gardner was not fully booked into the jail upon his arrival or at any point thereafter. When he arrived on August 13, he was placed into an intake cell, where he remained until he was taken by EMS to the hospital on August 31.

19. Mr. Gardner's attorneys have submitted multiple requests for records to Brantley County, the Brantley County Sheriff's Office, and Faith Family Practice, both under the Georgia Open Records Act and as his counsel pursuant to a validly executed health and privacy information release. These entities have either actively refused or otherwise failed to provide certain information in response to his requests. Critical information in this case is therefore within the exclusive possession and control of Defendants.

20. Mr. Gardner was not given a proper medical examination at intake. His booking report indicated, however, he appeared to be a medical, mental health, or suicide risk, and that he appeared to have behavioral problems. The booking report was signed by Defendant Beers as the screening officer.

21. Mr. Gardner's behavior and demeanor throughout his 19-day detention made clear that he was in need of evaluation and treatment for serious mental illness. He did not have any clothing on for nearly the entire 19-day period he spent in the facility. Officers at the jail also noted that he appeared to have "some kind of mental disability."

22. Mr. Gardner did not eat or drink water for days at a time — for one period of at least seven straight days (potentially longer) — during his 19-day stay at the Brantley County Jail.

23. On August 15, 2024, Defendant Wilson, the Jail Medical Officer, reported the following:

> • Refused New Intake: (1) m Gardner, Jeffrey (08:55)
> (5-18) wouldn't get dressed

24. Video footage shows that Defendants Bohannan, Wilson, and Jacobs entered Mr. Gardner's cell and observed his condition on multiple occasions throughout his 19-day period of detention. Given the state of Mr. Gardner's condition when he left the jail, it is clear that they observed that he was not eating or drinking water, was in serious need of medical and/or mental health treatment, and was in danger of severe injury or death if he was not provided with such treatment. They failed to take any action, however.

25. On August 25, 2024, unnamed jail officials requested that the County's private medical provider examine Mr. Gardner because he was not eating, was failing to respond to questions, and "appear[ed] to have some kind of mental disability."

26. In response to this request, Defendant Veal evaluated Mr. Gardner on August 25, 2024. Veal noted that Mr. Gardner was not eating and appeared to suffer from mental illness.

27. From review of video footage, it appears that Veal was simply making rounds when he saw Mr. Gardner on August 25. Thus, jail officials simply mentioned to him to take a quick look at Mr. Gardner.

28. Veal was in Mr. Gardner's cell for less than two minutes.

29. Veal was subjectively aware that Mr. Gardner had serious medical needs, specifically the need for further mental health evaluation and treatment, and treatment aimed at ensuring he was consuming sufficient food and water. Despite being aware that Mr. Gardner could be seriously injured or killed if he did not receive such medical attention, Veal took no other action. He never instructed jail staff to seek the advice of a mental health specialist. He never took steps to ensure Mr. Gardner was eating, drinking, and receiving care. In fact, he never even followed up with jail staff. Instead, he disregarded Gardner's condition until he learned that Mr. Gardner had been hospitalized in a state of near death.

30. Defendants Able and Wilson were present during Veal's visit on August 25. They observed Mr. Gardner's condition and were aware that he was not eating or drinking water. Despite being aware of the danger this presented to Mr. Gardner, they took no action to get him mental health or further medical treatment.

31. Based on these failures to act, Mr. Gardner's condition continued to deteriorate.

32. On August 30, Defendant Jacobs entered Mr. Gardner's cell and instructed him to "get up and take a shower." Mr. Gardner responded that he was unable to get up and walk out. Jacobs responded "You can stand up. You ain't that damn weak." He also said Mr. Gardner had "pissed on [himself]."

33. A few minutes later, Defendants Bohannan, Perry, and Wilson arrived and entered Mr. Gardner's cell. The officers placed Mr. Gardner in a wheelchair, transported him out of his cell for a shower, and then returned him to his cell.

34. Despite their knowledge that Mr. Gardner had not eaten or consumed water in days; that he had urinated on himself; and that <u>he was too weak to stand or walk</u>, Defendants Bohannan, Perry, Jacobs, and Wilson took no action to get Mr. Gardner mental health treatment, medical treatment, or any other care.

35. On August 31, 2024, Defendants Perry, Bohannan, Wilson, and Jacobs entered Mr. Gardner's cell. Over the next two hours, the officers repeatedly entered the cell and observed Mr. Gardner but took no action.

36. Finally, two hours later, Defendant Jacobs called EMS, reporting that Mr. Gardner had not eaten in six days and could not get up.

37. EMS arrived and transported Mr. Gardner directly to the hospital, where he was determined to be in near-death condition. Doctors assessed him with severe sepsis, acute kidney

injury, severe dehydration, urinary tract infection, hypothyroidism, hypothermia, urinary tract infection, myxedema coma, pneumomediastinum, right pneumothorax, and acute coronary syndrome. He had lost as many as 70 pounds in the 19 day since he had been brought to the Jail. He was unable to answer questions about his condition, but apparently EMS reported that he "had anorexia for 5 days" and was "found on the floor in his jail cell."

38. Mr. Gardner was admitted to the hospital and underwent extensive medical treatment. He stayed in the hospital until September 5, 2023. He continues to suffer from physical and mental pain due to his experience in the Brantley County Jail.

39. Brantley County Jail Policy 1.7 provides that when an inmate arrives at the facility, the officer must complete a "a Medical History Form and Medical Receiving Screening Form." The officer who conducts "the medical screening is to ensure that the inmate understands each question concerning his/her medical history and/or physical condition." And if the "inmate has a non-emergency injury/illness the booking deputy should note the injury/illness, initiate the steps to provide the necessary medical treatment in accordance with Policy 5.4, and document the action taken on the Medical History Form."

40. Brantley County Jail Policy 5.3 provides that a "complete health appraisal" is to be conducted of "all inmates within 14 days of admission, which includes a physical examination and psychological screening." The appraisal must "include:

    a. A review of the Health History Form and the Medical Receiving Screening Forms.

    b. Collection of additional information to complete medical, dental, psychiatric and immunization histories.

    c. Administration of laboratory and/or diagnostic tests when applicable to detect communicable diseases, including venereal diseases and tuberculosis.

      d.  Height, weight, pulse, blood pressure, and temperature.

      e.  Administration of other tests and examinations as appropriate.

      f.  Completion of a medical examination with comments about current mental and dental status.

      g.  When appropriate, additional investigations may be conducted into alcohol and drug abuse, and other related problems."

41.    The health appraisal mandated under Policy 5.3, including the results of the medical examination and any tests or flagged potential problems, must be reviewed by a physician.

42.    Brantley County Jail Policy 6.15 (entitled "Hunger Strike") require jail staff to follow certain procedures when an inmate enters a hunger strike, whether "declared or undeclared." The shift supervisor and jail administrator must be notified. After the inmate has refused nine consecutive meals, he must be placed in medical isolation and examined by a physician. Medical personnel must measure his weight and vital signs each day, and these measurements are to be recorded in the inmate's medical file. The Jail Administrator must maintain a record of all activities and food intake by the inmate. And if the examining physician determines that the inmate's condition is life-threatening, the jail administrator must notify the county attorney and request a court order to feed the inmate. Brantley County Jail Policy 5.14 (governing feeding procedures) indicates that the jail serves three meals per day.

43.    Brantley County Jail Policy 5.4 provides that if an "inmate refuses medical treatment, a refusal of medical treatment form is to be completed and placed in the inmate's medical file."

44.    Defendants failed to follow any of the procedures set forth above. For starters, neither Beers nor any other officer completed a "Medical History Form" nor a "Medical Receiving

Screening Form" when Mr. Gardner arrived at the Jail.  Mr. Gardner was not seen by a physician upon arrival, and there is no indication that a physician ever examined him or reviewed any of his information at any point between his arrest and his transfer (by EMS) to the hospital.  Defendant Beers also failed to "initiate the steps to provide the necessary medical treatment" for Mr. Gardner's mental health issues, and to document the action taken.  Had he done so, Mr. Gardner would have received evaluation and treatment before his condition deteriorated so severely.

45. Defendant Wilson (the Jail Medical Officer who visited Mr. Gardner's cell on multiple occasions) apparently made a note for Mr. Gardner stating "refused new intake," but she never took any further steps.  She never again sought to have Mr. Gardner undergo an initial medical examination.  She did not complete a refusal of treatment form.  And she did not ensure that a physician reviewed any information obtained from an exam of Mr. Gardner.  At no point did Defendant Wilson initiate the health appraisal required under Policy 5.3, and as a corollary, no physician reviewed any information from such a report.  Had Defendant Wilson complied with these duties, Mr. Gardner would have received evaluation and treatment before his condition deteriorated so severely.

46. Mr. Gardner went at least seven days without eating (potentially many more) and significant periods without drinking water.

47. Defendants Perry, Bohannan, Wilson, Able, and Jacobs all observed him multiple times during periods where he was not eating or drinking.  On August 25, for example, Defendants Able and Wilson were present for Veal's visit, which occurred after jail staff reported that Mr. Gardner was not eating.

48. After three days (and therefore nine consecutive meals), jail staff had a duty to initiate the procedures set forth in Policy 6.15.  They failed to do so.  Mr. Gardner was never

examined by a physician (and to the extent Veal's visit qualifies, he was never examined after August 25). Mr. Gardner did not eat from at least August 25 onwards. Yet he was not examined during this period of time. The Brantley County Defendants did not measure his weight and vital signs each day. They did not record such measurements in Mr. Gardner's file. Defendant Bohannan (the Jail Administrator) did not maintain a record of all activities and food intake by Mr. Gardner. And the Brantley County Defendants did not take any other action to ensure Mr. Gardner received the care he needed to avoid the danger of serious illness or death, a danger which all Defendants appreciated.

49. Video footage shows that throughout Mr. Gardner's detention at Brantley County Jail, rather than provide Mr. Gardner with the care he needed, Defendants simply yelled at him and refused to take any action to ensure his health and safety.

50. Significant sections appear to be missing from the video footage thus far provided by jail staff. The footage appears to be selectively edited to remove interactions between jail staff and Mr. Gardner.

51. Jail staff also physically harmed Mr. Gardner on multiple occasions, causing him serious burns and injuries to his backside and ear.

52. Mr. Gardner is not in custody.

## COUNT ONE
### *Negligence*
### (against the Brantley County Defendants)

53. Mr. Gardner hereby adopts, incorporates, and realleges Paragraphs 1–52 as if fully set forth herein.

54. As law enforcement officers and jail officers, the Brantley County Defendants were each in a special relationship with Mr. Gardner and had a duty to protect his health and safety.

55. The Brantley County Defendants violated several ministerial duties and thereby failed to discharge their duty to protect Mr. Gardner's health and safety.

56. Defendant Beer did not complete the appropriate health information paperwork and did nothing to ensure Mr. Gardner received care for his mental illness, in violation of Brantley County Jail Policy 1.7.

57. Defendant Wilson failed to ensure Mr. Gardner underwent a "complete health appraisal," in violation of Brantley County Jail Policy 5.3.

58. Despite observing Mr. Gardner multiple times and being aware that he had not eaten for more than three days, Defendants Jacobs, Bohannan, Able, Perry, and Wilson violated Brantley County Jail Policy 6.15 by failing to have Mr. Gardner placed in medical and examined by a physician, and failing to measure his weight and vital signs each day (and record them in his file).

59. Defendant Bohannan failed to maintain a record of all of Mr. Gardner's activities and food intake and failed to involve the county attorney to initiate the process of getting Mr. Gardner medically fed.

60. The Brantley County Defendants knew or should have known that their failures to act as required presented a risk of harm to Mr. Gardner.

61. The Brantley County Defendants breached the duties they owed to Mr. Gardner by failing to take appropriate action in response to this risk of harm.

62. But for these breaches of duty, Mr. Gardner would have received the medical treatment and other invention he needed and would not have been injured

63. The Brantley County Defendants are therefore liable to Mr. Gardner for his injuries.

## COUNT TWO
### *Deliberate Indifference under the Eighth and/or Fourteenth Amendments 42 U.S.C. § 1983*
### (against all Defendants)

64. Mr. Gardner hereby adopts, incorporates, and realleges Paragraphs 1–52 as if fully set forth herein.

65. Mr. Gardner's condition and the course of his detention posed a strong likelihood that he would suffer serious illness or death. This was an objectively serious danger that was sufficiently serious to violate the Eighth and Fourteenth Amendments.

66. Defendants subjectively knew that Mr. Gardner was at risk of serious harm or death.

67. Defendants' actions and inactions went beyond mere negligence, as they did absolutely nothing to prevent Mr. Gardner from suffering severe injury or death until he had not eaten for at least 6 days, was unable to get up, and had severe medical complications as described above.

68. At all times relevant to this Complaint, Defendants were undertaking their duties as prison employees, or as a private contractor performing a public duty (Veal), and were therefore acting "under color of law" for the purposes of § 1983.

69. But for Defendant's actions and inactions, Mr. Gardner would not have been injured.

70. Defendants are not entitled to qualified immunity; Veal is a private actor, and all Defendants acted with the mental state necessary to violate the Eighth Amendment, they are not entitled to qualified immunity. *See, e.g.*, *Richardson v. McKnight*, 521 U.S. 399, 412 (1997) (concluding that although prison guards employed by a private contractor are subject to § 1983 claims, they are not entitled to qualified immunity); *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1186 (11th Cir. 1994), *overruled on other grounds by Hope v. Pelzer*, 536 U.S. 730,

739 n.9 (2002) ("'A finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials who *deliberately* ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law.'").

### COUNT THREE
*Attorney Fees and Expenses of Litigation under 42 U.S.C. § 1988 and O.C.G.A. § 13-6-11*
**(against all Defendants)**

71. Mr. Gardner hereby adopts, incorporates, and realleges all prior Paragraphs of this Complaint as if fully set forth herein.

72. Mr. Gardner is entitled to recover expenses of litigation, including attorney fees, under O.C.G.A. § 13-6-11 because Defendants have acted in bad faith, been stubbornly litigious, and caused Mr. Gardner unnecessary trouble and expense.

73. Mr. Gardner is also entitled to recover attorney fees if he is the prevailing party under 42 U.S.C. § 1988.

### COUNT FOUR
*Punitive Damages*
**(against all Defendants)**

74. Mr. Gardner hereby adopts, incorporates, and realleges all prior Paragraphs of this Complaint as if fully set forth herein.

75. By engaging in the above-described conduct, Defendants actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences so as to entitle Mr. Gardner to punitive damages pursuant to O.C.G.A. § 51-12-5.1 and 42 U.S.C. § 1983.

WHEREFORE, Mr. Gardner prays:

a) That this Complaint be filed and summonses be issued as provided by law;

b) That he receive a judgment in her favor against Defendants;

c) That he be awarded special and general damages in an amount to be determined by the enlightened conscience of the jury;

d) That he be awarded attorneys' fees and other costs of litigation, pursuant to e.g., O.C.G.A. § 13-6-11 and 42 U.S.C. § 1988;

e) That all costs of this action be cast upon the Defendants; and

f) That he receive such other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

/s/ *Derek Rajavuori*
Derek S. Rajavuori
Georgia Bar No. 577647
**DSR Law, LLC**
6075 Barfield Road
Suite 3300
Sandy Springs, Georgia 30328
678-916-6893
derek@dsrlawyer.com

*Attorney for Plaintiff*